NOT DESIGNATED FOR PUBLICATION

No. 118,206

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JAYHAWK PIPELINE, L.L.C.,
*Appellee*,

v.

MWM OIL CO., INC.; BENJAMIN M. GILES; MIKE A. GILES, DARREN KIRKPATRICK;
C.R. MORRIS, AND MORRIS ENERGY, LLC,
*Appellants*.

MEMORANDUM OPINION

Appeal from Butler District Court; DAVID A. RICKE, judge. Opinion filed October 26, 2018.
Affirmed.

*Kurt A. Harper* and *Terry L. Unruh*, of Sherwood, Harper, Dakan, Unruh & Pratt, LC, of Wichita,
for appellants.

*David E. Bengtson* and *Patrick A. Edwards*, of Stinson Leonard Street LLP, of Wichita, for
appellee.

Before GARDNER, P.J., GREEN and HILL, JJ.

PER CURIAM: In this appeal, we are asked to review the dismissal of a declaratory
judgment action by the district court. The court held that the appraiser chosen to assess
the value of oil and gas reserves did exactly what the parties wanted in their settlement
agreement. This resulted in the owner of the surface rights to a tract of land not having to
pay any money to the owners of the working interest to the oil and gas lease on the
property. To us, one side argues that the appraisal did not satisfy their agreement and the
court erred when it ruled that it did. The other side argues it does satisfy their agreement

1

and the court was correct. Given the limited record, we find no error in the ruling of the district court. We affirm.

*This case begins as a declaratory judgment action followed by a settlement agreement.*

This lawsuit began as a declaratory judgment action. The parties settled. Jayhawk Pipeline, LLC, the owner of the surface rights to 40 acres in Butler County, agreed to pay the appraised fair market value of any proved undeveloped oil and gas reserves to the owners of the working interest to the oil and gas lease that covered the property. The Lessees were MWM Oil Co., Inc., Benjamin M. Giles, Mike A. Giles, Darren Kirkpatrick, C.R. Morris, and Morris Energy, LLC. When the appraiser stated that there were *no* proved undeveloped reserves—meaning that Jayhawk Pipeline would pay nothing to the Lessees, instead of dismissing their lawsuit as promised, both sides returned to court.

Under the settlement agreement, the Lessees retained the right to continue to operate their two existing wells, but agreed to relinquish their right to drill any new wells on the land. In return, Jayhawk agreed to pay the Lessees the fair market value of any proved undeveloped reserves in and under the subject land. The parties agreed to appoint a panel of three qualified appraisers to appraise the fair market value of the reserves. The panel was to consist of one appraiser selected by the Lessees, one selected by Jayhawk, and one from Lee Keeling and Associates, Inc. The agreement continued:

> "Each party may provide the Panel with any information and documentation that such Party believes to be relevant to valuation of the fair market value of the PUD Reserves. Also, the Panel may ask questions of or request additional information or documentation from either Party relating to the Whipple Lease and/or the Whipple Wells in connection with its valuation of the PUD Reserves, and the Parties agree to cooperate with the Panel in answering such questions and providing such information and documentation.

2

> "The Panel shall be responsible for developing the procedures and processes for valuing the PUD Reserves and coming to a consensus of such value. If the Panel is unable to agree on those procedures and processes, then Panel shall contact and work with John Woolf whose decision resolving any such disputes as to those procedures and processes shall be binding upon the Panel. The Panel shall arrive at an agreed fair market value of the PUD Reserves on or before September 30, 2016."

The parties agreed to dismiss the lawsuit with prejudice within three business days of Lessees' receipt of the payment from Jayhawk.

Gordon Romine, the President of Lee Keeling and Associates, Inc., sent a letter to the parties revealing that he and the two other appointed appraisers had met "to begin the process of determining the Fair Market Value of the Proved Undeveloped Reserves on the Whipple Lease as set out in the Settlement Agreement." But he stated that there was a "wide divergence" in the evaluations done by the other two appraisers and it would be "difficult" for the three appraisers to agree on a fair market value as required by the settlement agreement. In response, the Lessees' attorney sent a letter to the panel of appraisers conveying that he and Jayhawk's attorney met with the judge and both agreed to proceed with Romine serving as the sole appraiser.

Romine submitted his appraisal. In it, he listed three classifications of proved reserves: "producing," "behind pipe," and "undeveloped." He determined the fair market value of the proved "producing" reserves was $859,898. But he listed no fair market value for proved "behind pipe" or "undeveloped" reserves. Instead, he stated "none assigned" for the gross oil reserves in those categories. This finding stirred up both sides.

The parties filed cross-motions to enforce the settlement agreement, with Jayhawk arguing that since Romine determined there were no proved undeveloped reserves under the subject tract, it owed no money to the Lessees under the settlement agreement. Jayhawk asked the court to dismiss the suit with prejudice. For their part, the Lessees

3

argued that Romine did not actually appraise the proved undeveloped reserves. Instead, he appraised something not required by the settlement agreement. The Lessees asked the court to enforce the settlement agreement by reconstituting a new panel of three appraisers to determine the fair market value of the proved undeveloped reserves.

For reasons that are not clear from the record, neither party called Romine to testify when the district court heard arguments on the motions. At one point, the court raised the possibility of sending a special question to Romine asking if he intended to assign a zero fair market value to the proved undeveloped reserves but the Lessees objected.

The court concluded the matter. First, it ruled that both parties had agreed to modify the settlement agreement to allow a single appraiser to appraise the reserves. Next, the court held that while Romine went "well beyond" appraisal of just the proved undeveloped reserves on the subject land, he did appraise the reserves by finding no undeveloped reserves could be considered "proved." The court noted that Romine's task was to appraise the "proved" undeveloped reserves, not the potential, possible or speculative undeveloped reserves. The report "does determine the value of proved undeveloped reserves and that value is zero." The court found that Jayhawk's obligation under the settlement agreement was to pay nothing and that the journal entry of dismissal should be signed.

An agreed order of dismissal with prejudice was filed and the Lessees appeal.

*The district court correctly ruled that Romine appraised the reserves as required by the settlement agreement.*

Our standard of review is important here. The parties agree that we may review this matter de novo. When we do so, appellate courts exercise unlimited review over the

4

interpretation and legal effect of written instruments and are not bound by the lower court's interpretation of those instruments. *Prairie Land Elec. Co-op v. Kansas Elec. Power Co-op*, 299 Kan. 360, 366, 323 P.3d 1270 (2014). In addition, where controlling facts are based on written or documentary evidence, we have the same opportunity to examine and consider the evidence as the trial court, and it determines de novo what the facts establish. *Foundation Property Investments v. CTP*, 286 Kan. 597, 611, 186 P.3d 766 (2008).

The controlling facts here are based on Romine's written report and other documentation submitted by the parties with their motions to enforce the settlement agreement. We note that no witnesses testified in the district court.

*Romine determined no undeveloped reserves could be considered "proved" and assigned a $0 fair market value for them.*

In his letter to counsel, Romine understood that his task was to determine the fair market value of the proved undeveloped reserves. But several statements in his later report call that into question. He states:

- "we have prepared an appraisal of the working interest owner's share of the oil and gas rights to the captioned property."
- "the present worth of the future net revenue to be realized by MWM from the operation of Whipple Number 7 is $859,898."
- "In addition to the net revenue to be realized by producing the Whipple Number 7 to depletion, the tract does offer what could be considered a significant upside to MWM. It is our opinion a purchaser would consider this in an offer to purchase MWM's lease hold rights."
- "Under terms of the Agreement, MWM has given up essentially its upside to this tract. It is our opinion that this destroys the marketability of the tract

5

and thus the value to MWM. The compensation due MWM is thus estimated to be $859,898."

These statements show that Romine appraised the value of the Lessees' remaining ownership interest in the subject land after the settlement agreement was completed, not the value that Lessees lost because of the settlement agreement.

But other statements suggest that Romine did appraise the reduction in value of the Lessees' ownership interest because of the settlement agreement, as the parties requested:

- "Under terms of the Agreement, MWM can continue to operate its two producing wells and perform the necessary well work including recompletion to other zones until all reserves are depleted. It cannot drill additional wells on the tract."

- "The purpose of this appraisal is to determine the compensation due MWM from the reduction in value of its leasehold rights as a result of Jayhawk's acquisition."

Even so, Romine did specifically consider whether there were proved undeveloped reserves on the subject tract. He considered the "Arbuckle" and "Lansing-Kansas City" zones because those were the only zones producing in modern times. He reported:

"**Proved Undeveloped Reserves (Subject Tract)**

Arbuckle Formation

Proved Undeveloped Reserves cannot be assigned to the Arbuckle Formation. Of the two Arbuckle oil wells drilled on this tract, the Number 7 well is a commercial success, but the other has not produced enough oil to return the cost of drilling, completion and operation. In the absence of any geologic interpretation that explains the reason for this fact, no locations on the tract can be considered as 'Proved.'

Lansing-Kansas City Zones

6

> No Proved Undeveloped Reserves are assigned to the Lansing-Kansas City Zones. The zones behind the casing in the two wells are untested. There are no wells on the tract producing from the Lansing-Kansas City or none offsetting the tract, thus no locations are considered proved."

Romine also noted that "both wells were logged with radioactive logs that will permit determination of a zone's porosity, but not its fluid saturation."

Romine's conclusion—that no reserves in the Lansing-Kansas City zones could be considered "proved"—was supported by the documentation given to him by Jayhawk. Randy Miller, a consulting engineer, analyzed the materials prepared by the Lessees. In a letter that Jayhawk submitted to Romine, Miller stated:

> "To be included in the category of 'proved' reserves, the reserves must be reasonably certain to be economically producible. Due to the recently drilled Whipple #6 well and Whipple #7 well, which are both Arbuckle producers, additional Arbuckle development of the undrilled 20 acres on the 40-acre tract would have reasonabl[e] certainty of being economically producible. Therefore, the additional Arbuckle potential for that 20-acres can be classified as proved undeveloped reserves.

> "Additional potential in the LKC cannot be developed with a reasonable certainty of being economically producible based on the following facts: First, no new well has been completed in the LKC in the vicinity of the 20-acres in the last 50 years. Second, the pilot LKC water flood on the Anderson lease between 1965 and 1974 was not successful. Third, when the Whipple #6 and Whipple #7 were drilled in 2008 and 2012 respectively, the LKC zone was not drill stem tested to confirm producibility and no resistivity log were run to determine the reservoir fluid makeup in that zone. Due to those factors, any additional LKC reserves would be high risk and low probability of success."

Miller distinguished between "possible" and "proved." He criticized the information provided by the Lessees as "inaccurate and unreliable." He stated, "First, the only 'proved undeveloped reserves' are those attributed to the Arbuckle formation. Second, the only

reliable estimate of the Arbuckle reserves under the remaining 20 acres must be determined by decline curve analysis of the existing Arbuckle producers on that 40-acre tract."

As for the Arbuckle zone, Romine determined that because Whipple #6 was not a producer, and with no geological explanation for that, he could not consider the undeveloped reserves on that zone "proved" either. While this analysis was not in Miller's letter, it is not this court's task to question the methodology used by Romine to appraise the reserves. Our question is whether Romine did appraise the reserves. We hold that he did.

We do not have all the materials that Romine relied on to complete his report. His report states that the "information developed during the course of this investigation, basic data, maps and worksheets showing recovery determinations are available for inspection in our office." That information is not in the record. And the Lessees objected to the district court's suggestion that they get more clarification from Romine. With no further clarification, the two paragraphs in Romine's report under the heading "Proved Undeveloped Reserves (Subject Tract)" must speak for themselves.

Romine did not consider any of the undeveloped reserves associated with the land "proved." Thus he assigned no value or $0 fair market value to the proved undeveloped reserves. This satisfies the requirement in the settlement agreement, as amended, that the appraiser come up with a fair market value of those reserves.

Lessees contend that the settlement agreement assumes that the proved undeveloped reserves have some value. The settlement agreement says that Jayhawk will pay Lessees the fair market value of those reserves. The appraised fair market value is $0. Thus, Jayhawk owes the Lessees $0. The requirements of the settlement agreement were met.

Affirmed.